UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

KEVIN HOPSON, Individually and on   )
Behalf of All Others Similarly Situated,   )
                                    )
            Plaintiff,              )          CIVIL ACTION NO.
                                    )
VS.                                 )          3:09-CV-2392-G
                                    )
METROPCS COMMUNICATIONS,            )
INC., ET AL.,                       )
                                    )
            Defendants.             )

## MEMORANDUM OPINION AND ORDER

Before the court is the motion of the defendants, MetroPCS Communications

Inc. ("MetroPCS" or "the company"), Roger D. Linquist ("Linquist"), J. Braxton

Carter II ("Carter"), and Thomas C. Keys ("Keys") (collectively, the "defendants"), to

dismiss the plaintiff's consolidated amended complaint for failure to state a claim

under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  For the reasons stated

below, the motion is granted.

# I. BACKGROUND

Lead plaintiff Kevin Hopson[1] (the "plaintiff") brings this federal securities class action under sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") for losses sustained after purchasing shares of MetroPCS's common stock at "artificially inflated prices" resulting from the defendants' "materially false, misleading, and reckless statements and omissions regarding MetroPCS's business prospects." *See* First Amended Complaint ("Amended Complaint") ¶¶ 31, 38 (docket entry 30). The defendants move to dismiss, arguing that the plaintiff has failed to state a plausible claim for securities fraud because the amended complaint does not allege facts supporting a strong inference of scienter and the representations alleged to be fraudulent are forward-looking statements protected by the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4 *et seq. See generally* Memorandum of Law in Support of Defendants' Motion to Dismiss the Consolidated Amended Complaint ("Defendants' Brief") at 1-3 (docket entry 32).

MetroPCS is the fifth largest facilities-based wireless telecommunications provider in the United States, offering subscribers unlimited-usage wireless communication services on a pre-paid basis.[2] Defendants' Brief at 3; Amended

---

[1]     The court granted Kevin Hopson ("Hopson")'s unopposed motion for appointment as lead plaintiff and approval of his selection of counsel (docket entry 5) by order dated May 11, 2010 (docket entry 24).

[2]     The four larger facilities-based wireless carriers are AT&T, Verizon
(continued...)

Complaint ¶ 20.  At all times relevant to this dispute, MetroPCS's common stock has

been traded in an efficient market on the New York Stock Exchange ("NYSE"),

Amended Complaint ¶ 20, and Linquist, Carter, and Keys (collectively, the "senior

executives") have served as the Chairman, President and Chief Executive Officer, the

Chief Financial Officer and Executive Vice President, and the Chief Operating Officer

of MetroPCS, respectively.  *Id.* ¶¶ 21-22, 24.  The senior executives direct

MetroPCS's business affairs and finances, represent themselves as individuals with

knowledge about MetroPCS's business outlook and business practices, and undertake

to lead the company's conference calls with analysts and investors.  See *id.*

A.  The Alleged Misstatements and Omissions

The plaintiff alleges that on eight occasions, between February 26, 2009 and

November 5, 2009 (the "class period"), Amended Complaint ¶ 1, the defendants

made materially false or misleading statements or omissions that artificially inflated

the value of MetroPCS common stock in violation of sections 10(b) and 20(a) of the

Exchange Act.  *Id*. ¶¶ 47, 51, 55, 58, 69, 76, 80, 83.  On each occasion, according to

the plaintiff, MetroPCS or its senior executives made false or misleading

representations about:  (1) the accuracy of the 2009 earnings guidance that the

company issued on November 5, 2008 and reaffirmed throughout the class period;

(2) the strength of MetroPCS's business model in the recessionary economy; (3) the

---

[2](...continued)
Wireless, Sprint Nextel, and T-Mobile.  Defendants' Brief at 3.

impact of increased competition on the overall business of MetroPCS; and/or (4) the relationship between subscriber growth and churn,[3] including how a $49 handset promotion was likely to, and did, increase churn by attracting disloyal customers who were inclined to leave MetroPCS after the promotional period ended.  See *id.*

1. *Statements and Omissions Regarding MetroPCS's 2009 Guidance*

The plaintiff identifies the following representations about MetroPCS's 2009 earnings guidance as materially false or misleading in violation of section 10(b) of the Exchange Act:  on February 26, 2009, MetroPCS issued a press release ("February Press Release") announcing its financial results for the fourth quarter and year end of 2008.  *Id.* ¶ 39.  Reaffirming the 2009 guidance, the press release stated, "MetroPCS today reaffirms guidance the Company originally provided on November 5, 2008 that MetroPCS expected net subscriber additions in the range of 1.4 million to 1.7 million on a consolidated basis.  The Company currently expects Consolidated Adjusted EBITDA [Earnings Before Interest Taxes Depreciation and Amortization] to be in the range of $900 million to $1.1 billion for the year ending December 31, 2009."  *Id.*

---

[3]        Churn is the percentage of subscribers in a given time frame that cease to use the company's services. "The calculation represents (a) the number of customers who have been disconnected from the MetroPCS network during the period less the number of customers who have reactivated service, divided by (b) the sum of the average monthly number of customers during the period."  Defendants' Brief at 2 n.2 (citing MetroPCS Communications, Inc. 2008 Annual Report, Securities and Exchange Commission Form 10-K, dated March 2, 2009 ("2008 Annual Report"), *located in* Appendix in Support of Defendants' Motion to Dismiss the Consolidated Amended Complaint ("Defendants' Appendix") *as* Exhibit 1, at 000079 (docket entries 33, 34).

(emphasis omitted). On a conference call with analysts and investors following the press release ("February Conference Call"), Linquist reiterated the company's reaffirmation of guidance and professed, "[W]e believe we are perfectly positioned to offer customers a superior value proposition." *Id.* ¶ 40 (emphasis omitted).

On May 7, 2009, MetroPCS issued a press release ("May Press Release"), announcing financial results for the first quarter of 2009 and reporting net subscriber additions of approximately 684,000 -- the highest quantity of net additions in the company's history. *Id.* ¶ 59. According to the press release, "The Company currently expects Consolidated Adjusted EBITDA to be in the range of $900 million to $1.1 billion for the year ending December 31, 2009." *Id.* ¶ 60 (emphasis omitted). Linquist, commenting on the results, stated in part, "Our rate of net subscriber additions has accelerated, and we have recorded over 1.6 million net subscriber additions during the last twelve months, representing total subscriber growth of approximately 37% in that period. . . ." *Id.* ¶ 59 (emphasis omitted).

On August 6, 2009, MetroPCS issued a press release ("August Press Release") announcing its financial results for the second quarter of 2009, which again reaffirmed the 2009 guidance. *Id.* ¶ 85. During a conference call with analysts and investors that followed ("August Conference Call"), Carter stated that "subscriber net additions for the second quarter, while lower than Wall Street consensus, do not reflect lower gross additions, but are the result of higher gross additions from

customers' purchasing promotional handsets in previous quarters where the initial investment in their handset did not result in loyalty to MetroPCS. The MetroPCS value proposition is selling very well." *Id.* ¶ 88 (emphasis omitted).

The plaintiff alleges that the above-referenced statements were materially false or misleading because they were "based on purported good quality subscriber growth for the quarter, a complementary economic environment, and a solid competitive position," while the defendants ignored signs that the growth was due to a large influx of promotional customers, the economy was faltering, and competition in the pre-paid wireless services sector was increasing. See *id.* ¶¶ 68, 93.

## 2. *Statements and Omissions Regarding the Economy*

The plaintiff lists the following statements made by the defendants about the economy as materially false or misleading: during the February Conference Call, Linquist stated that throughout 2008 the company's "core and expansion markets continued to gain meaningful penetration even given the significant headwinds of a deteriorating economy. . . ." *Id.* ¶ 40 (emphasis omitted). Similarly, Carter stressed that "MetroPCS is one of the few companies that has continued to demonstrate resilience as our economy makes its way through these difficult economic times." *Id.* ¶ 41.

On March 9, 2009, MetroPCS made a presentation at the Raymond James Institutional Investors Conference ("Raymond James Conference"). *Id.* ¶ 48. At the

conference, Carter discussed MetroPCS's growth despite the tumultuous economy. Specifically, Carter stated that MetroPCS "is uniquely positioned to grow market share in this type of environment" and the company "is actually accelerating its growth" during "these very difficult times." *Id.* (emphasis omitted).

Commenting on the May Press Release, Linquist stated, "In the midst of the ongoing challenging economic conditions, and as voice continues to go wireless, we see consumers recognizing the value of our service as well as consumers cutting the wireline cord. . . ." *Id.* ¶ 59 (emphasis omitted). According to Linquist, the "resilience of our business model and the dedication and focus of our employees" enabled the company to reaffirm 2009 guidance despite the fact that "the U.S. economy continues to be challenged." *Id.* (emphasis omitted).

During a conference call with analysts and investors following the May Press Release ("May Conference Call"), Linquist posited that even though the "economy will continue to struggle for the foreseeable future," the company is "perfectly positioned to continue to offer customers a superior value proposition." *Id.* ¶ 61 (emphasis omitted). Keys agreed, explaining that "[t]he troubled economic times we're experiencing are driving a change in the way people spend money. Consumers are looking for the most value for every dollar they spend. We think this is a permanent change and we are perfectly positioned to take advantage of this

reevaluation. . . .  Even during these difficult economic times, we have continued to grow."  *Id.* ¶ 62 (emphasis omitted).

On that same day, May 7, 2009, MetroPCS announced that the company would no longer pre-release subscriber results.  *Id.* ¶ 67.  The company's statement on the issue declared,  "We commenced the pre-release of subscriber results in late 2007 given the concern of how our business model would perform during difficult economic times.  That concern has been put to rest.  As a MetroPCS business model has proven to be extremely resilient.  To put any rumors to rest now, our second quarter is off to a strong start and we plan on being aggressive in capturing additional market share during the upcoming quarters."  *Id.* (emphasis omitted).

On May 15, 2009, MetroPCS hosted an event for analysts and investors ("May Analyst Day").  While there, Carter stated, "We're perfectly situated to take advantage of these very, very difficult times where people are looking for value. . . ."  *Id.* ¶ 71 (emphasis omitted).  Discussing why the company did not raise its guidance for the year, he explained that "what our internal policy is, is only to address guidance again during major earnings releases.  And we all know that there's still a lot going on with our economy.  The model's performing very, very well, but there's a lot of headwinds out there.  We'll look at this situation very closely in the second quarter, and then we'll make what determinations we need to make.  But, the good news is the year has been off to an incredible start."  *Id.* (emphasis omitted).

On May 28, 2009, MetroPCS made a presentation at the Barclay's Capital Wireline and Wireless Conference ("Barclay Conference"). *Id.* ¶ 81. The plaintiff alleges that one of the defendants stated, "[W]e're uniquely positioned to continue to grow aggressively during tough economic times because there is no credit exposure. It's a unique position to be in in wireless. . . . I remember two years ago everybody was very nervous about how this model would perform during a recessionary environment. And our thesis has always been that we felt it would be somewhat contra-cyclical. It's a shame that it had to be proved, but this model has proven to be extremely resilient and very well positioned for the times that we're in."[4] *Id.* (emphasis omitted).

Commenting on the August Press Release, Linquist stated that "[w]hile challenging economic conditions persist, we continue to invest in differentiation and we are bullish on the growth opportunity within pay-in-advance unlimited wireless. With 36% subscriber growth over the past year, we are confident our growth will continue. . . ." *Id.* ¶ 85. Similarly, during the August Conference Call, Linquist maintained that "[w]ith a focus on execution we believe our results demonstrate the strength and resiliency of our business, even in these difficult economic times." *Id.* ¶ 86 (emphasis omitted). Keys concurred, "[U.S.] economic weakness persists and consumers are looking for the most value for every dollar they spend. We think this

---

[4]     The amended complaint does not identify which defendant made these particular statements.

emphasis on value is permanent and a mindset change amongst consumers. Beginning in the fourth quarter of 2008, we aggressively positioned the Company to take advantage of this reevaluation in spending by making available lower-priced handsets. The change in sentiment towards consumers demanding more value for money accelerated our brand position. We believe our unlimited, flexible model is perfectly suited for this new economy. . . ." *Id.* ¶ 87 (emphasis omitted).

The plaintiff contends that these statements were materially false or misleading because the defendants knew that the recessionary economy was negatively impacting MetroPCS's business, *id.* ¶¶ 47, 51, the company was not "perfectly positioned" to take advantage of the economic downturn, *id.* ¶ 69, and the adverse effects of the economy caused the defendants to offer overly-aggressive promotions in an attempt to stimulate subscriber growth. *Id.* ¶ 93.

### 3. *Statements and Omissions Regarding Competition*

The plaintiff points to the following statements as representations regarding competition that were materially false or misleading in violation of section 10(b) of the Exchange Act: at the Raymond James Conference, while commenting on the effect of competition from Sprint Nextel's Boost Mobile ("Boost Mobile"), Carter opined: "I think the most important thing is we had our year-end call on the 26th of February, and we reaffirmed our guidance on that call, and that was after Boost [Mobile] had been out there for over a month. Certainly, if they were having a

significant impact on us, we would not have been in the position to do that." *Id.* ¶ 49.

When the issue was raised during the May Conference Call, Linquist explained, "[O]bviously the Sprint Boost [Mobile] people posted some very impressive numbers. . . . And I think what we're seeing is an expansion of the pay-in-advance segment for unlimited, no signed contract type service. So I think it's really an impact of the segment growing rather extensively. But then I come back to the fact that the numbers that we've seen from this third party looking at share, with our 25% share of gross additions being number one in the country among all carriers, it's obviously not had a great impact in our markets." *Id.* ¶ 64 (emphasis omitted). Linquist made similar comments at the May Analyst Day -- "[W]e believe we have a very strong competitive position," -- and Keys agreed -- "We have delivered more gross gains, more handset sales and more payment sales to these guys in the last 12 months than ever. So, I feel pretty confident how we stack up." *Id.* ¶ 74 (emphasis omitted).

A few days later, on May 18, 2009, MetroPCS made a presentation at the JPMorgan Global Technology, Media and Telecom Conference ("JPMorgan Conference"). *Id.* ¶ 77. There, Linquist reiterated his stance on competition from Boost Mobile: "[F]rom our standpoint, [Boost Mobile's] involvement, if anything expanded that market, and that market, I think, now is much more focused on

getting good value for their money.  Yes, I think we've seen them, but we had the best growth quarter we've ever had. . . .  So, at this point, its not been anything we can detect and see as an issue to be addressed. . . ."  *Id.* (emphasis omitted).

Keys maintained a similar position.  When asked about competition during the August Conference Call, he responded, "[T]o date in our Wal-Mart sales we've not seen any change in our sales from Wal-Mart, and so, therefore, we haven't seen the introduction of Track phone influencing our numbers at Wal-Mart.  I can't speak for the competition, but so far that hasn't been the case.  Understand that Boost [Mobile] now will be under Virgin's leadership I don't know how that's going to impact the marketplace, but it'll be interesting to see how that rolls out, as well."  *Id.* ¶ 90.  He later continued, "[L]et me just talk about Boost [Mobile] here for a second. We believe that they're probably doing well in markets where the model doesn't exist. They have a nationwide footprint, it's on the IDEN network. . . .  [W]e expect in markets where the model wasn't that they are doing very well. . . .  I think that's a wait and see game for us."  *Id.* ¶ 91 (emphasis omitted).

The plaintiff alleges that these statements were materially false or misleading because the defendants knew that competition was negatively impacting the company and failed to disclose that fact.  See, *e.g.*, *id.* ¶¶ 47, 83.

4. *Statements and Omissions Regarding Churn*

The plaintiff alleges that the defendants made materially false or misleading statements or omissions regarding the relationship between subscriber growth and churn, and how MetroPCS's introduction of a $49 handset promotion was likely to, and did, increase churn by attracting disloyal customers.  The plaintiff cites the following as examples:  during the February Conference Call, while discussing MetroPCS's introduction of the $49 handset promotion, which included activation of a "Kyocera Melo" mobile device and free unlimited usage for one month, Carter professed that the company did "not believe" that the promotion would "materially affect" its Cost Per Gross Addition ("CPGA").[5]  *Id.* ¶ 42.  Asked about churn, Carter explained that "incremental growth," particularly the "1.4 million incremental subs[criptions] this year versus roughly 1 million the year before," was "causing an increase in churn."  *Id.* ¶ 43 (emphasis omitted).

On April 7, 2009, MetroPCS issued a press release, "pre-releasing" its "First Quarter 2009 Subscriber Results," which stated in pertinent part:

> In the first quarter of 2009, on a consolidated basis, MetroPCS reported gross additions of over 1.5 million subscribers, which represents an increase of 59% over the first quarter of 2008.  Churn for the first quarter of 2009

---

[5]      "CPGA is determined by dividing (a) selling expenses plus the total cost of equipment associated with transactions with new customers less equipment revenues associated with transactions with new customers during the measurement period by (b) gross customer additions during such period."  *See* 2008 Annual Report, *located in* Defendants' Appendix *as* Exhibit 1, at 000079.

was 5.0% compared to 4.0% in the first quarter of 2008. One of the key drivers of the increase in churn was incremental gross additions of 857 thousand during the nine months ended December 31, 2008 as compared to the same period in 2007.

*Id.* ¶ 53 (emphasis omitted).

On April 21, 2009, a Macquarie Research Equities analyst report reviewed MetroPCS's $49 handset promotion: "MetroPCS launched the US$50 handset in the fourth quarter. . . . While we believe the phones cost Metro[PCS] a US$10-20 subsidy, we see it as worth the extra subsidy if it means a higher long-term sub[scriber] count, and the company has said that customers coming in at US$50 tend to stick around as long as those who spend at higher levels." *Id.* ¶ 56 (emphasis omitted). The report also indicated that dealers were getting paid $2 to collect a customer's monthly payment or $30 to sell a new handset and activate a new customer, but MetroPCS contacted some dealers "to ask them to not direct customers to new handsets rather than pay a bill, and [MetroPCS] has threatened action if dealers are caught [doing so]." *Id.* ¶ 58 (emphasis omitted).

During the May Conference Call, Keys opined, "We estimate that of the 5% churn we experienced in the first quarter, false churn is estimated at 1.7%. Without the false churn, our churn would be in the 3% range. The increase in churn is in part due to our record level of gross additions over the past nine months. Additionally, sales of our $49 handset have been strong and we believe that some subscribers are

upgrading their handsets as long.  As a new phone number is assigned, we are not capturing these upgrades as an offset to churn, thus, creating false churn." *Id.* ¶ 62 (emphasis omitted).

During that same call, when asked whether promotional customers should be counted as unqualified growth, Linquist stated that "the so-called $49 handset buyers do have a higher false churn because they typically are through indirect dealers who don't keep this information and don't track back that a customer is basically trading in a phone that he has already on our service, if they don't require their same number.  So higher false churn on the $49 overall we don't think is a significant difference." *Id.* ¶ 65 (emphasis omitted).  Carter affirmed, "[O]verall, we're not overly concerned because we're not seeing any adverse effect when you look at the interplay of everything and keeping our low CPGA down on the profitability of the business.  And bottom line, that's what we're here to do is create value for our shareholders." *Id.* ¶ 66 (emphasis omitted).

The senior executives made a number of comments about churn at the May Analyst Day.  Linquist, for example, stated:

> "We as a company do not have customer-based churn data that's concrete.  We really track handset churn.  And there's a very important distinction to be made here because with handset churn, we don't have the same advantage as you see on the customer side. . . .  [W]hen you port your number in the postpaid world, you have very good information going forward on who's churn and who stays on the system.  And in our world, where we're

following largely handsets and ESNs become important, customer information is, we think, reasonably good but certainly not perfect. . . . We do data mining. We go back and look at a customer's name and their pin number. Their pin number typically is their date of birth, but it can be something else. So when we make this kind of connection of last name and pin number, we can show that there's a much different discrepancy that our churn rate that we publish is really a gross churn rate and not a net churn rate . . . So, I would say 3.3% is in the range. I would say this is conservative, but it's not 5% and -- because we believe that it would be almost untenable to have a 60% dropout rate each year, grow as fast as we're growing, have as much -- shall we say, continuity and still maintain such a very high churn rate."

*Id.* ¶ 72 (emphasis omitted).

Carter expounded Linquist's point:

"We have a model where the growth is significantly accelerating, and that's the other part of the whole churn equation here. The highest churn is in the third month of a customer's tenure, and again it takes up to 12 months to get down to a mature level of churn at 2%. And this is a significant driver, because our growth is accelerating. . . . [I]f you think about an environment where there was no growth, then we would eventually normalize at that 2% term level. So it's truly a factor of the growth that this company is going through, which is the highest growth in the industry. That's a follow-up comment on the churn."

*Id.* ¶ 73 (emphasis omitted). Carter also discussed the company's ability to track false churn, saying, "We have very, very good visibility as to what's happening in our indirect channel. And remember, 85% of our distribution is in the indirect channel.

And there's been some very specific communications out there relating to upgrades."
*Id.* (emphasis omitted).

At the JPMorgan Conference, Linquist renewed his position on churn:  "Our churn as we've posted for the First Quarter of this year was what we call a 'gross churn' at 5% . . . [but] we show that the actual churn or a conservative statement of real churn if you take out those people that shall we say changed handsets in most cases, they bought a more significant handset than they had, is about 1.7% so our net churn which we believe is conservative was 3.3% in First Quarter and that's just because of the way we track the data. . . .  I'm saying that our churn rate is conservatively around 3% and that's just because we're limited in the way we can understand unit churn versus customer churn."  *Id.* ¶ 77 (emphasis omitted). Regarding the $49 handset promotion, Linquist explained, "I think we [have] seen a real stability in the plans themselves.  I think what we have seen is that we have offered a very set of attractive phones for $49 and what we've seen is that many people have increased their trade-in cycle shall we say, the length of that cycle to buy the new unit but the price plans have remained we think well we know stable."  *Id.* ¶ 78.

The August Press Release indicated that "[c]hurn increased 1.3% from 4.5% to 5.8%, when compared to the second quarter of 2008" and "[t]he key drivers in the increase in churn were incremental gross additions . . .  coupled with handset

upgrades from customers who did not identify themselves as existing customers." *Id.* ¶ 85. Linquist commented on the press release: "Although we experienced an increase in churn during the second quarter, this was due in part to our success in delivering increased gross additions over the previous nine months, seasonality and handset upgrades from customers who did not identify themselves as existing customers." *Id.* (emphasis omitted).

During the August Conference Call, Carter responded to a question about increased churn: "I think that the right way to look at churn is, we've been somewhat a victim of our own success. Certainly the upgrade phenomenon did increase over 30 basis points when you go through the numbers, and part of that was driven by the promotional handset activity that we had during the quarter. I want to be clear that on June 1st we moved away from the $49 handset to $59, and on August 1 we increased the $59 handsets to $69, so we have substantially moved away from that. . . . [W]hen we were selling handsets with the first month bundled in for free for $49 to the customer, we attracted customers who did not have as much buy-in investing into the MetroPCS value proposition. And while it enhanced our growth during the first quarter, what we saw is a lot of those customers were not loyal and left MetroPCS. Hence we've moved away from that pricing. . . ." *Id.* ¶ 89 (emphasis omitted).

The plaintiff alleges that these representations were materially false or misleading because the defendants knew that the $49 handset promotion was attracting opportunistic customers who had the right to walk away after one month, which would result in higher than average churn over time, *id.* ¶ 47, and that many of the promotional customers would not remain with MetroPCS after the first free month because they had very little investment in the company and it was cheaper to cancel service and purchase a new phone with another free month or defect to a competitor. *Id.* ¶ 69. Additionally, according to the plaintiff, the defendants had access to churn information through VeriSign Real-Time Rating and Payment system ("VeriSign"),[6] and later Amdocs CES 7.5 Billing, Customer Relationship Management and Operational Support System ("Amdocs"),[7] which "would have shown," or did show, that "churn was rapidly increasing because a large number of customers who purchased a $49 promotional handset had not remained loyal to MetroPCS. *E.g., id.* ¶¶ 47, 76. Finally, the plaintiff alleges that the defendants knew that a "large drop-off in promotional customers was causing churn but [they]

---

[6]     The plaintiff alleges that VeriSign "help[s] service providers manage their subscriber base, maximize revenue per use, and minimize churn." *Id.* ¶ 47 (internal quotation marks omitted).

[7]     The plaintiff alleges that Amdocs "provided real-time charging and billing, customer relationship management, and operational support to MetroPCS's pay-in-advance, roaming and retail offerings." *Id.* ¶ 76. According to the plaintiff, "Amdocs . . . showed that churn was rapidly increasing because a large number of customers who purchased a $49 promotional handset had not remained loyal to MetroPCS." *Id.*

continued to blame increased churn on subscribers purportedly upgrading their handset without porting over their number." *Id.* ¶ 76.

5. *MetroPCS's Adjustment of Guidance, Acknowledgment of Adverse Effects From Competition and a Challenging Economy, and Revelation of Elevated Churn*

On November 5, 2009, MetroPCS issued a press release announcing its third quarter financial results for 2009. *Id.* ¶ 94. For the quarter, the company reported consolidated total revenues of approximately $896 million, net subscriber additions of 66,000, and over 6.3 million subscribers. *Id.* The press release stated, "MetroPCS currently expects net subscriber additions in the range of 1.0 million to 1.2 million on a consolidated basis for the year ending December 31, 2009. The Company currently expects Consolidated Adjusted EBITDA to be in the range of $850 million to $950 million for the year ending December 31, 2009." *Id.* ¶ 94. Linquist acknowledged the shortcomings: "In a seasonally slow quarter, we reported net additions that were below our expectations, due primarily to elevated churn and a deceleration in gross additions. We believe this was the result of continued U.S. macro-economic weakness, an increasingly competitive environment, and upward adjustments we made to the price of certain handsets." *Id.* (emphasis omitted).

Following the third-quarter earnings announcement on November 5, 2009, MetroPCS hosted a conference call with analysts and investors. *Id.* ¶ 95. During that call, one of the senior executives stated, "This quarter's weakness in gross and net additions are evidence of the increasing challenging economic and competitive

environments. . . . Among other things this weak economy, coupled with the increased competitive environment and the seasonality of the business in the third quarter, has resulted in our weak net-add performance. . . . Due to MetroPCS's view that the US economy will continue to experience weakness, at least through the end of the year, and the increased competition in the world's market, MetroPCS will be reaffirming, in part, and revising, in part, our annual for 2009, originally provided by the Company on November 5, 2008."[8] *Id.* (emphasis omitted).

After MetroPCS lowered its guidance, the price of its stock fell to $6.01 per share, *id.* ¶ 96, significantly lower than the class-period high of $18.85. *Id.* ¶ 52. The plaintiff alleges that the company's executive compensation structure -- which rewarded the senior executives if the MetroPCS posted favorable financial results, *id.* ¶ 109, -- and a number of "insider" transactions that occurred on or around the class-period high, *id.* ¶ 103, prove that the defendants engaged in a scheme to defraud the market and artificially inflate the company's stock. According to the plaintiff, "Carter sold over 90% of his unrestricted stock holdings for approximately $2.6 million in insider trading proceeds; Christine Kornegay sold 100% of her unrestricted stock for approximately $1.3 million in insider trading proceeds, and TA Associates, Inc. sold shares for approximately $4.1 million in insider trading proceeds. All told, between March 26 and April 6, 2009, TA Associates, Inc. sold shares for approximately $8.25

---

[8]     The amended complaint does not allege which senior executive in particular made these statements.

million in insider trading proceeds." *Id.* ¶ 102 (emphasis omitted). The plaintiff insists "[t]hat these insider sales were made pursuant to Rule 10b5-1 plans does nothing to rebut the inference of scienter drawn from the suspicious timing and amount of the alleged insider sales."[9] *Id.* ¶ 106.

## II. ANALYSIS

### A. Dismissal Standard

"To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead 'enough facts to state a claim to relief that is plausible on its face.'" *In re Katrina Canal Breaches Litigation*, 495 F.3d 191, 205 (5th Cir. 2007) (quoting *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544, 570 (2007)), *cert. denied*, 552 U.S. 1182 (2008). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citations, quotations marks, and brackets omitted). "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Katrina Canal*,

---

[9]     "A 10b5-1 plan is an agreement 'which allows corporate insiders to set a schedule by which to sell shares' over time, and which can 'raise an inference that the sales were pre-scheduled and not suspicious.'" *Central Laborers' Pension Fund v. Integrated Electrical Services Inc.*, 497 F.3d 546, 554 n.4 (5th Cir. 2007) (quoting *Wietschner v. Monterey Pasta Company*, 294 F. Supp. 2d 1102, 1117 (N.D. Cal. 2003)).

495 F.3d at 205 (quoting *Twombly*, 550 U.S. at 555) (internal quotation marks omitted). "The court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *Id.* (quoting *Martin K. Eby Construction Company, Inc. v. Dallas Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004)) (internal quotation marks omitted).

The Supreme Court has prescribed a "two-pronged approach" to determine whether a complaint fails to state a claim under Rule 12(b)(6). See *Ashcroft v. Iqbal*, __ U.S. __, 129 S.Ct. 1937, 1949-50 (2009). The court must "begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id*. at 1950. The court should then assume the veracity of any well-pleaded allegations and "determine whether they plausibly give rise to an entitlement of relief." *Id*. The plausibility principle does not convert the Rule 8(a)(2) notice pleading to a "probability requirement," but "a sheer possibility that a defendant has acted unlawfully" will not defeat a motion to dismiss. *Id*. at 1949. The plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged -- but it has not 'show[n]' -- 'that the pleader is entitled to relief.'" *Id*. at 1950 (*quoting* FED. R. CIV. P. 8(a)(2)). The court, drawing on its judicial experience and common sense, must undertake the

"context-specific task" of determining whether the plaintiff's allegations "nudge" his claims against the defendants "across the line from conceivable to plausible."  See *id.* at 1950, 1952.

As a consequence of the PSLRA, a plaintiff alleging fraud under section 10(b) of the Exchange Act must satisfy the heightened pleading requirements imposed by Rule 9(b) of the Federal Rules of Civil Procedure.[10]  See *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 412 (5th Cir. 2001) (explaining that the PSLRA "incorporates [Rule 9(b)'s] standard for pleading fraud").  Rule 9(b) states that "[i]n alleging fraud . . ., a party must state with particularity the circumstances constituting fraud. . . ."  FED. R. CIV. P. 9(b).  The Fifth Circuit interprets Rule 9(b) strictly, requiring the plaintiff to "specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent."  *Williams v. WMX Technologies, Inc.*, 112 F.3d 175, 177-78 (5th Cir.), *cert. denied*, 522 U.S. 966 (1997); see also *Benchmark Electronics, Inc. v. J.M. Huber Corporation*, 343 F.3d 719, 724 (5th Cir. 2003) (holding that Rule 9(b) requires the plaintiff to specify "the who, what, when, where, and how" of the alleged fraud).

---

[10]     The heightened pleading standard of Rule 9(b) "provides defendants with fair notice of the plaintiffs' claims, protects defendants from harm to their reputation and goodwill, reduces the number of strike suits, and prevents plaintiffs from filing baseless claims in an attempt to discover unknown wrongs."  *Tuchman v. DSC Communications Corporation*, 14 F.3d 1061, 1067 (5th Cir. 1994).

The PSLRA also requires a plaintiff alleging securities fraud to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," 15 U.S.C. § 78u-4(b)(2)(A), that is, facts giving rise to a strong inference of "scienter."[11]  In *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007), the Supreme Court held that "[t]o qualify as 'strong' within the intendment of § 21D(b)(2) . . ., an inference of scienter must be more than merely plausible or reasonable -- it must be cogent and at least as compelling as any opposing inference of non-fraudulent intent."  *Id.* at 314.  Accordingly, to ascertain whether the plaintiff has stated a cognizable claim for securities fraud, this court must comparatively assess the "competing inferences rationally drawn from the facts alleged" to determine whether the facts alleged sufficiently support a strong inference of scienter.  *Id.*

---

[11]      The Supreme Court has defined scienter as "a mental state embracing intent to deceive, manipulate, or defraud."  *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976).  The Fifth Circuit has held that scienter can be shown by "either intent or *severe recklessness*."  See *Financial Acquisition Partners LP v. Blackwell*, 440 F.3d 278, 287 (5th Cir. 2006) (emphasis in original).  Severe recklessness "is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it."  *Integrated Electrical*, 497 F.3d at 551.

## B. The Plaintiff's Claims Under the Exchange Act

Section 10(b) of the Exchange Act forbids (1) the "use or employ[ment] . . . of any . . . deceptive device," (2) "in connection with the purchase or sale of any security," and (3) "in contravention of such rules and regulations" promulgated by the Securities and Exchange Commission ("SEC"). 15 U.S.C. § 78j(b). Commission Rule 10b-5, 17 C.F.R. § 240.10b-5 (2004) ("Rule 10b-5"), prohibits, among other things, the making of any "untrue statement of a material fact" or the omission of any material fact "necessary in order to make the statements made . . . not misleading." *Id.*; see also *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 238 (5th Cir. 2009). To state a claim for securities fraud under section 10(b) of the Exchange Act and Rule 10b-5, the plaintiff must allege, in connection with the purchase or sale of securities, (1) a misstatement or an omission (2) of a material fact (3) made with scienter (4) on which the plaintiff relied (5) that proximately caused the plaintiff injury. *Lormand*, 565 F.3d at 238-39; *Rosenzweig v. Azurix Corporation*, 332 F.3d 854, 865 (5th Cir. 2003).

In his first amended complaint, the plaintiff alleges that on eight occasions MetroPCS or its senior executives made false or misleading statements or omissions regarding the company's 2009 earnings guidance, the economy, competition, and/or churn. Amended Complaint ¶¶ 47, 51, 55, 58, 69, 76, 80, 83. The defendants argue that the plaintiff has not alleged facts sufficient to support a "strong inference" of

scienter, the plaintiff has failed to plead his claims with particularity, and the representations alleged to be false or misleading are immaterial puffery or forward-looking statements protected by the PSLRA.  Defendants' Brief at 2-3.  The court agrees with the defendants.

### 1.  *The Plaintiff Has Not Pleaded Facts Sufficient to Support a Strong Inference of Scienter*

Usually, on a motion to dismiss, the court must draw all reasonable inferences in the plaintiff's favor; however, the PSLRA requires that the court consider plausible inferences opposing as well as supporting a strong inference of scienter.  *Lormand*, 565 F.3d at 239.  Thus, under the PSLRA, a "plausible or reasonable" inference of scienter is not enough.  *Tellabs*, 551 U.S. at 314.  Instead, the plaintiff must allege facts giving rise to an inference of scienter that is "cogent and at least as compelling as any opposing inference of nonfraudulent intent."  *Id.*; see also *Lormand*, 565 F.3d at 239 ("The inference of scienter must ultimately be 'cogent and compelling,' not merely 'reasonable' or 'permissible.'").

As an initial matter, the court notes that the plaintiff has failed to plead scienter with particularity for each individual defendant.  The plaintiff incorrectly suggests that he may aver scienter generally to satisfy the *Tellabs* standard.  Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Consolidated First Amended Complaint ("Opposition Brief") at 11-12 (identifying allegedly suspicious insider sales made by some of the defendants as sufficient

"standing alone" to create an inference of scienter). It is a well-established rule in this circuit, however, that scienter must be pleaded with particularity for each individual defendant: "group pleading" -- that is, pleading the general collective knowledge or state of mind of all of the corporation's officers and employees -- cannot withstand a motion to dismiss. See *Indiana Electrical Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.*, 537 F.3d 527, 533 (5th Cir. 2008); *Southland Securities Corporation v. INspire Insurance Solutions, Inc.*, 365 F.3d 353, 366 (5th Cir. 2004). The plaintiff alleges circumstantial facts peculiar to Carter and Keys that are relevant to the court's scienter inquiry, but he fails to plead any facts from which the court can draw a compelling inference that Linquist acted with the requisite mental state. *See* Amended Complaint ¶¶ 100-13.

While the plaintiff contends that he has pleaded Linquist's scienter by alleging that in 2008 "Linquist earned $710,577 (a 21% increase from 2007 in which he earned $586,154), and a total compensation package of nearly $10.7 million," Amended Complaint ¶ 111, the court finds this argument unpersuasive. Fifth Circuit precedent precludes this court from making a strong inference of scienter based solely on an allegation that the defendant's compensation structure provided a motive for the alleged fraud. See *Indiana Electrical*, 537 F.3d at 544 ("[I]ncentive compensation can hardly be the basis on which an allegation of fraud is predicated. . . . [It] may be considered in conjunction with other scienter allegations . . . but only in an

extraordinary case is it probative." (internal citations and quotation marks omitted)).

Since the plaintiff does not allege that Linquist engaged in any insider trades during the class period or that he personally reviewed or should have reviewed the churn information allegedly provided by VeriSign and Amdocs, the court finds that the plaintiff has failed to plead any cognizable basis on which to infer that Linquist acted with an intent to deceive.

The plaintiff nevertheless highlights three allegations in his amended complaint that he argues sufficiently support a strong inference of scienter. First, the plaintiff alleges that "MetroPCS insiders sold virtually all of their unrestricted MetroPCS stock holdings" during the class period. Opposition Brief at 11. In particular, during the class period, Carter sold over 90% of his unrestricted stock holdings for approximately $2.6 million in insider trading proceeds, Keys sold 100% of his holdings for $119,000, Christine Kornegay sold 100% of her holdings for $1.3 million, and TA Associates, Inc. sold stock for over $12 million in proceeds. *Id.* at 11-12. The plaintiff claims that during the nine months preceding the class period, Carter sold only 10,000 shares, and Keys and Christine Kornegay did not sell any of their unrestricted stock holdings. *Id.* at 12. According to the plaintiff, the timing and amount of these sales are sufficiently suspicious[12] to create a strong inference of

_____

[12]     Fifth Circuit precedent makes clear that allegations of insider sales are essentially a form of motive and opportunity allegations, which may meaningfully enhance the strength of the inference of scienter if and only if the sales are "in

(continued...)

scienter, despite Form 4s filed with the SEC indicating that these sales were made pursuant to 10b5-1 trading plans.[13]  See *id.* at 14.

Second, the plaintiff claims that the senior executives' compensation structure, which tied compensation to the company's performance, provided a motive to commit fraud.  *Id.* at 16-17.  The plaintiff contends that "[b]ecause 2008 was a strong year for MetroPCS, and because [the senior executives] were richly rewarded for that strong year, they had motive to continue growth during the Class Period."  *Id.* at 17.  Indeed, from 2007 to 2008, Linquist's compensation increased by 21%, Carter's compensation increased by 20%, and Keys' compensation increased by 46%.  *Id.*  According to the plaintiff, the senior executives' compensation structure supplied an incentive for growth of net subscriber additions and motivated the senior executives to push promotional phones despite knowing that promotional customers were not as loyal as non-promotional customers.  *Id.*

Finally, the plaintiff argues that the defendants' access to VeriSign and Amdocs must have revealed, by January 2009 at the very latest, high churn and smaller-than-

---

[12](...continued)
suspicious amounts or at suspicious times."  *Southland*, 365 F.3d at 368 (internal quotation marks omitted).

[13]      Form 4 is a document that a person who owns more than 10 percent of any class of any equity security, or who is a director or an officer of the issuer of such security, must file with the SEC "if there has been a change in such ownership" of those securities.  15 U.S.C. § 78p(a); see also *Reliance Electric Company v. Emerson Electric Company*, 404 U.S. 418, 440 (1972).

predicted subscriber growth. *Id.* at 17-21. The plaintiff alleges that Carter admitted that customer churn becomes visible in the third month after a subscriber addition, so the churn rate of customers who bought the $49 promotional handset when it was first offered in October 2008 was visible to the company by January 2009, yet the defendants repeatedly discounted increases in churn as "false churn," and maintained that the handset promotion was nothing but accretive to the company. *Id.* at 17-18. The plaintiff contends that the defendants warned dealers against directing customers to new promotional handsets rather than paying the bill on their existing phone, stopped pre-releasing subscriber results, and abruptly discontinued the handset promotion because they knew that it was increasing churn and inflating subscriber additions. *Id.* at 18-19.

The Fifth Circuit has interpreted *Tellabs* as requiring a "three step approach" for review of scienter allegations on a motion to dismiss:

> First, the allegations must, as in federal pleadings generally, be taken as true.
>
> Second, courts may consider documents incorporated in the complaint by reference and matters subject to judicial notice. The facts must be evaluated collectively, not in isolation, to determine whether a strong inference of scienter has been pled.
>
> Third, a court must take into account plausible inferences opposing as well as supporting a strong inference of scienter. The inference of scienter must ultimately be "cogent and compelling," not merely "reasonable" or "permissible."

*Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corporation*, 565 F.3d 200, 207-08 (5th Cir.) (quoting *Indiana Electrical*, 537 F.3d at 533), *cert. denied*, __ U.S. __, 130 S.Ct. 199 (2009).  The plaintiff insists that his factual allegations support a strong inference of scienter.  While the facts alleged in the amended complaint might reasonably raise questions about the defendants' motives and opportunities to commit fraud, the plaintiff has not made the "cogent" and "compelling" case required by *Tellabs*.

At bottom, none of the plaintiff's allegations standing alone is sufficient to support a strong inference of scienter, and the plaintiff's argument to the contrary is unavailing.  *See generally* Opposition Brief.  This court, and others in this circuit, have refused to find a strong inference of scienter based on insider sales made pursuant to Rule 10b5-1 trading plans, *Congregation of Ezra Sholom v. Blockbuster, Inc.*, 504 F. Supp. 2d 151, 165 (N.D. Tex. 2007) (Godbey, J.), an executive compensation structure tying compensation to corporate profits, *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 434 (5th Cir. 2002), or the defendants' alleged access to information that might have contradicted their representations, *Indiana Electrical*, 537 F.3d at 540.

More importantly, however, reviewing the allegations *in toto* also does not support a *strong* inference of scienter.  The plaintiff's allegation that the insider sales were suspicious in time or amount ignores the admitted fact that those sales were made pursuant to preexisting Rule 10b5-1 trading plans, which cuts against an

inference of suspiciousness,[14] *Ezra Sholom*, 504 F. Supp. 2d at 165; his indictment of

---

[14]    The plaintiff would have this court ignore the defendants' 10b5-1 trading plans.  *See* Opposition Brief at 11-15.  Such plans, however, may rebut an inference of suspiciousness.  See *Integrated Electrical*, 497 F.3d at 554 n.4; *Ezra Sholom*, 504 F. Supp. 2d at 165.  In this case, the plaintiff incorporated the 10b5-1 trading plans into his amended complaint by reference, Amended Complaint ¶ 106 ("That these insider sales were made pursuant to Rule 10b5-1 plans does nothing to rebut the inference of scienter drawn from the suspicious timing and amount of the alleged insider sales."), and the defendants supplemented the record by including copies of the relevant Form 4s in an appendix attached to their motion to dismiss.  *See generally* Defendants' Appendix at 000263-000268.  Accordingly, the court may properly consider those plans, and the relevant Form 4s, when weighing the competing inferences regarding the insider sales.  See *Indiana Electrical*, 537 F.3d at 533 ("[C]ourts may consider documents incorporated in the complaint by reference and matters subject to judicial notice.").  Both Carter's and Keys' insider sales were made on the first day that such transactions were permissible under their respective trading plans, and in an amount permitted under the plans.  *See* Securities and Exchange Commission Form 4 for Thomas C. Keys, dated June 1, 2009, *located in* Defendants' Appendix *as* Exhibit 8 ("Keys Form 4"), at 000263-64 (indicating that the "Date of Earliest Transaction" was "06/01/2009," which is the date within the class period, according to the plaintiff, that Keys sold his shares); Securities and Exchange Commission Form 4 for J. Braxton Carter II, dated April 2, 2009 ("Carter Form 4"), *located in* Defendants' Appendix *as* Exhibit 9, at 000265-66 (indicating that the "Date of Earliest Transaction" was "04/02/2009," which is the date within the class period, according to the plaintiff, that Carter sold his shares).  The timing and amount of theses sales suggest that Carter and Keys were not engaged in a scheme to defraud the market and profit from insider information; rather they consummated previously scheduled transactions pursuant to 10b5-1 trading plans.  That the dates of these transactions coincided with class-period highs for the value of MetroPCS stock does not support a strong inference of scienter because the 10b5-1 trading plans were established well before the transactions occurred.  *See e.g.*, Carter Form 4, *located in* Defendants' Appendix *as* Exhibit 9, at 000266 ("The sales reported in this Form 4 were effected pursuant to a Rule 10b5-1 trading plan adopted by the reporting person on May 18, 2007. . . ."); Securities and Exchange Commission Form 4 for Christine B. Kornegay, dated April 2, 2009, *located in* Defendants' Appendix *as* Exhibit 10, at 000268 (same); Keys Form 4, *located in* Defendants' Appendix *as* Exhibit 8, at 000264 (same).  The plaintiff overlooks the fact that these sales followed the vesting of previously awarded stock options, and he miscalculates the percentage of Carter's

(continued...)

MetroPCS' executive compensation structure is unpersuasive and would subject

countless corporate executives to allegations of fraud, *Tuchman*, 14 F.3d at 1068-69;

and his argument that VeriSign and Amdocs must have revealed that the handset

promotion was increasing churn fails because he does not allege with particularity any

details about the information provided by VeriSign and Amdocs, such as who viewed

-- or should have viewed -- that information, when they did so, and how such conduct

supports a strong inference of scienter for each named defendant, *Magruder v.

Halliburton Company*, No. 3:05-CV-1156-M, 2009 WL 854656, at *14 (N.D. Tex.

Mar. 31, 2009) (Lynn, J.).  Taken as a whole, the plaintiff's averments do not support

a strong inference of scienter.[15]  Instead, the plaintiff's allegations seemingly depict

---

[14](...continued)
and Keys' holdings sold during the class period by comparing the number of shares
that they sold to the number of shares that vested, rather than comparing the number
of shares that they sold to their complete holdings.  *See, e.g.*, MetroPCS 2009 Notice
of Annual Meeting and Proxy Statement, dated April 15, 2009, *located in* Defendants'
Appendix *as* Exhibit 4, at 000214-15 (detailing the complete holdings of the senior
executives).  Accordingly, even if this court were to ignore the 10b5-1 trading plans,
and the relevant Form 4s, the result would be the same because the plaintiff's
allegations regarding the suspiciousness of Carter's and Keys' insider sales during the
class period do not raise a compelling inference of scienter.

[15]     Additionally, since the plaintiff does not specifically describe the data or
information provided by VeriSign and Amdocs, and therefore cannot connect any
specific information provided by those systems to the defendants' representations
about churn, the court cannot reasonably infer that the defendants' conduct
represented "an extreme departure from the standards of ordinary care, and . . .
present[ed] a danger of misleading buyers or sellers which [was] either known to the
defendant[s] or [was] so obvious that the defendant[s] must have been aware of it."
See *Rosenzweig*, 332 F.3d at 866 (citation and internal quotation marks omitted).

commonplace non-fraudulent business practices. *Cf. Abrams*, 292 F.3d at 434 ("On a practical level, were the opposite true, the executives of virtually every corporation in the United States would be subject to fraud allegations."). Because the plaintiff has failed to adequately plead scienter with respect to any of the individual defendants, his claims against all of the defendants, including MetroPCS, must be dismissed. *Southland*, 363 F.3d at 366 ("For purposes of determining whether a statement made by the corporation was made by it with the requisite Rule 10(b) scienter we believe it appropriate to look to the state of mind of the individual corporate official or officials who make or issue the statement. . . ."); *see also* 15 U.S.C. § 78u-4(b)(1) to (3)(A) ("In any private action arising under this chapter, the court shall, on the motion of any defendant, dismiss the complaint if the [pleading] requirements of paragraphs (1) and (2) are not met").

Even if the plaintiff had pleaded scienter, however, his amended complaint would still have to be dismissed for failure to state a claim. In the discussion that follows, the court will assume for the sake of argument that the plaintiff has properly pleaded scienter and review each of his claims in turn.

2. *The plaintiff's claims regarding churn are not pleaded with particularity*

The most substantial of the plaintiff's claims are those alleging that the defendants made misrepresentations about churn. These allegations, however, lack the specificity and particularity that Rule 9(b) and the PSLRA demand. Admittedly,

the plaintiff identifies the statements alleged to be false, when and where those statements were made, and -- with a few exceptions -- the individuals who made those statements. *See, e.g.*, Amended Complaint ¶¶ 42-43, 47, 53, 58, 62, 65-66, 69, 72-73, 76-77, 78, 89. The plaintiff fails to allege with particularity, however, why these statements were false or misleading when made. To cure this defect, the plaintiff contends that the defendants knew or were reckless in not knowing facts contradictory to their public representations. *See* Opposition Brief at 20-21.

According to the plaintiff, the senior executives knew or should have known by January 2009 that the handset promotion was increasing churn because VeriSign and Amdocs provided access to churn information three months after a new subscriber addition and the $49 handset promotion began in October of 2008. *See* Opposition Brief at 17-18. The plaintiff, however, does not contest the veracity of Linquist's statement that the company does not "have customer-based churn data that's concrete" but rather it "track[s] handset churn," which means that MetroPCS has to estimate churn by "data mining" to determine whether a new subscriber is indeed a new customer based on the "name" and "pin number" that they used to sign up for service. *See* Amended Complaint ¶ 72. Because the plaintiff does not describe the information provided by VeriSign and Amdocs, the only plausible inference that the court may draw in the plaintiff's favor is that those systems are the avenues through which MetroPCS conducts its "data mining" to track churn. Even so, the plaintiff

fails to allege that VeriSign and Amdocs reported higher churn than what the defendants estimated it to be. See *id.* ("[W]hen we make this kind of connection of last name and pin number, we can show that there's a much different discrepancy that our churn rate that we publish is really a gross churn rate and not a net churn rate . . . So, I would say 3.3% is in the range. I would say this is conservative, but it's not 5%. . . ."). Indeed, beyond quoting Carter as saying that the company has "very, very good visibility into as to what is happening in [the company's] indirect channel," *Id.* ¶ 73, the plaintiff provides no specifics about what the "churn information" revealed, who reviewed that information, and how the defendants' representations were materially false or misleading in light of that information.[16] In short, the court is asked to speculate whether all -- or none -- of the defendants reviewed the information allegedly provided by VeriSign and Amdocs, whether and when that

---

[16]     The plaintiff alleges that the Macquarie Research Equities analyst report demonstrates the defendants' knowledge of increases in churn due to the handset promotion. *See* Amended Complaint ¶ 58 ("[D]efendants were clandestinely warning dealers against permitting promotional customers to cancel service . . . to purchase a new promotional phone. . . ."). However, the plaintiff does not allege "who supplied the information to the analyst, how the analyst received the information, and how the defendant was entangled with or manipulated the information and the analyst." See *Southland*, 365 F.3d at 373. The plaintiff has not satisfied the pleading requirements necessary to assert a claim of fraud based on the "conduit" theory, *Barrie v. Intervoice-Brite, Inc.,* 397 F.3d 249, 261-62 (5th Cir.), *modified on other grounds and rehearing denied by* 409 F.3d 653 (5th Cir. 2005), so the court cannot reasonably rely on the statements in the analyst report -- regarding the company saying that promotional customers tend to stick around as long as non-promotional customers yet contacting dealers to dissuade them from directing customers to the handset promotion -- to draw any inferences of fraud.

information verily indicated an increase in churn due to the handset promotion, and how that information comports with the representations about churn made by the defendants individually and collectively.[17]

Stripped of its conclusory allegations regarding the defendants' knowledge of this nebulous "churn information," the amended complaint falls far short of stating a plausible claim for fraud.  See *Abrams*, 292 F.3d at 432 ("An unsupported general claim about the existence of confidential corporate reports that reveal information contrary to reported accounts is insufficient to survive a motion to dismiss.  Such allegations must have corroborating details regarding the contents of allegedly contrary reports, their authors and recipients."); *Flaherty*, 565 F.3d at 208 ("[O]missions and ambiguities count against inferring scienter"); see also *Southland*, 365 F.3d at 365 ("[W]e do not construe allegations . . . against the 'defendants' as a group as properly imputable to any particular individual defendant unless the

---

[17]        To the extent the plaintiff is arguing that the senior executives, given their position within the company, were severely reckless in not knowing that the handset promotion was increasing churn and/or by not reviewing the churn information provided by VeriSign and Amdocs, this argument has been flatly rejected by the Fifth Circuit.  *Southland*, 365 F.3d at 365 ("[E]ven if a corporate officer's position supports a reasonable inference that he likely would be negligent in not being involved in the preparation of a document or aware of its contents, the PSLRA state of mind requirement is severe recklessness or actual knowledge."); see also *Magruder*, 2009 WL 854656, at *9 (quoting *Abrams*, 292 F.3d at 432) ("'A pleading of scienter may not rest on the inference that defendants must have been aware of the misstatement based on their positions within the company.'").  Allegations of "positional scienter" are not enough to withstand a motion to dismiss.  *Magruder*, 2009 WL 854656, at *9.

connection between the individual defendant and the allegedly fraudulent statement is specifically pleaded.").  In the words of *Iqbal*, 129 S.Ct. at 1950, 1952, the plaintiff's allegations are simply too vague to nudge his claims against the defendants across the line from conceivable to plausible.

### 3. *Representations about the 2009 guidance, economy, and  competition are forward-looking statements or immaterial puffery*

The plaintiff argues that the defendants made materially false or misleading statements or omissions by reaffirming the 2009 guidance during the class period. The defendants counter that these representations are either generalized positive assertions about the company's future prospects that are immaterial as a matter of law or forward looking statements accompanied by meaningful cautionary language, and to the extent that they are not, the plaintiff fails to allege that the statements were actually false when made.  Defendants' Brief at 2.  The defendants', not the plaintiff's, position is more solidly rooted in law.

Under section 21E of the PSLRA, the defendants are not be liable for a forward-looking statement if it is "identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u-5(c)(1) ("safe harbor").  "The requirement for 'meaningful' cautions calls for 'substantive' company-specific warnings based on a realistic description of the risks applicable to the particular circumstances, not merely

a boilerplate litany of generally applicable risk factors." *Southland*, 365 F.3d at 372

(quoting H.R. Conf. Rep. No. 369, 104th Cong., 1st Sess. 31, 44 (1995)).

Oral statements can qualify for the safe harbor if "(i) the statement is

accompanied by a cautionary statement that the 'particular' oral statement is

forward-looking and that actual results could differ materially (essentially a formality

as to the form of the statement); (ii) the statement is accompanied by an oral

statement that additional information that could cause actual results to differ

materially is contained in a readily-available written document; (iii) the statement

identifies the document or portion thereof containing the additional information; and

(iv) the identified document itself contains appropriate cautionary language." *Id*.

(citing 15 U.S.C. §§ 77z-2(c)(2), 78u-5(c)(2)). The phrase "readily available

documents" refers to documents that are "filed with the SEC" and those that are

"generally disseminated." *Id*. (citing 15 U.S.C. §§ 77z-2(c)(3), 78u-5(c)(3)).

In the present case, each of the statements made by the defendants in the

company's earnings announcements and press releases are forward-looking

statements. *See* 15 U.S.C. § 78u-5(i)(1)(A)-(F) (explaining that forward-looking

statements include, among other things, a statement that contains "a projection of

revenues" and a "statement of future economic performance"); see also *Home Solutions*

*of America Investor Group v. Fradella*, No. 3:06-CV-1096-N, 2008 WL 1744588, at * 5-

6 (N.D. Tex. Mar. 24, 2008) (Godbey, J.) (citing 15 U.S.C. § 78u-5(i)(A)-(C) (same).

Moreover, each is identified as a forward-looking statement and accompanied by meaningful cautionary language. For example, the February Press Release states that "[t]he Company currently expects Consolidated Adjusted EBITDA to be in the range of $900 million to $1.1 billion for the year ending December 31, 2009," identifies the word "expect[s]" as indicative of a forward-looking statement, and explains that one of the factors that might materially affect the accuracy of that statement is the company's "ability to sustain the growth rates we have experienced to date." *E.g.*, MetroPCS Communications, Inc. 2008 Earnings Release, dated February 26, 2009 ("2008 Earnings Release"), *located in* Defendants' Appendix *as* Exhibit 5, at 000232-000233 (describing the company's 2009 guidance, the senior executives' statements on the earnings, and cautionary language warning that factors that might materially affect the forward-looking statements include among other things "the highly competitive nature of our industry," "an economic slow down, recession or depression in the United States," and "our ability to sustain the growth rates we have experienced to date."). This cautionary language is not just a boilerplate litany of risk factors generally applicable to all businesses; it identifies risks that are specific to MetroPCS as a prepaid wireless service provider and its ability to achieve the forecasts predicted in the 2009 earnings guidance. The Fifth Circuit has upheld practically identical language as meaningfully cautionary, where such language included warnings of realistic risks that were specific to the company. See *Rozenweig*, 332 F.3d at 869

("There can be no assurances that we will be successful in securing any financing arrangements."). Contrary to the plaintiff's contention, this language is palpably more substantive and company-specific than the language that the Fifth Circuit rejected as boilerplate in *Lormand*.

In *Lormand*, the Fifth Circuit held that a disclaimer that accompanied the defendant US Unwired's forward-looking statements was generic and not meaningfully cautionary. *Lormand*, 565 F.3d at 244. The disclaimer at issue stated that "US Unwired's statements in its documents are 'not guarantees of future performance . . . and involve known and unknown risks and other factors that could cause actual results to be materially different from any future results expressed or implied by them.'" *Id.* The language used in the present case is plainly distinguishable from the disclaimer at issue in *Lormand*. The defendants here go well beyond simply stating that there are "known and unknown risks and other factors" that might affect the accuracy of the forward-looking statements. Moreover, the defendants specifically identify actual risks endemic to MetroPCS's business model that might affect the company's future economic performance and its ability to realize the earnings projected in the 2009 guidance. *E.g.*, 2008 Earnings Release, *located in* Defendants' Appendix *as* Exhibit 5, at 000233 (identifying the ability to maintain the present growth rate, an obvious reference to the subscriber growth rate, and the ability to secure spectrum and network infrastructure equipment as potential

factors that might affect the forward-looking statements).  While the cautionary language undoubtedly includes *some* generic or boilerplate language, it indisputably goes further by also providing substantive company-specific warnings regarding the 2009 guidance, far enough to fall within the safe harbor of the PSLRA.  See *Stockman v. Flotek Industries, Inc.*, No. No. H-09-2526, 2010 WL 3785586, at *24 (S.D. Tex. Sept. 29, 2010) ("These earnings guidance statements were forward-looking and were accompanied by both general statements of caution and by specific cautionary disclosures.").

The oral statements made by the defendants, during conference calls with analysts and investors, that reiterated the company's reaffirmation of the 2009 guidance are similarly protected by the PSLRA safe harbor.  Each of those conference calls began with a statement cautioning that certain information might constitute forward-looking statements, using the words that typically identify those statements, reviewing the risk factors that might affect the accuracy of those statements, and referring the call's participants to the earnings statements and filings with the SEC for further review.[18]  *E.g.*, MetroPCS Communications, Inc. 4Q08 Earnings Call

---

[18]     MetroPCS's 2008 annual report specifically warns:  "Softening sales and increased customer turnover, or churn, in the second and third calendar quarters of the year usually combine to result in fewer net customer additions during the second and third calendar quarters," that "products and service offerings may not be successful or prove to be profitable" and "failing to manage our churn . . . could adversely affect our business," and "[t]he market for our wireless services is highly competitive . . ..  The national carriers also have introduced, either directly or through

<span style="text-align:right">(continued...)</span>

Transcript, dated February 26, 2009, *located in* Defendants' Appendix *as* Exhibit 2, at 000152-53. Accordingly, each of the statements made by the defendants reaffirming the 2009 guidance during the various conference calls detailed above are non-actionable forward-looking statements.

The plaintiff seeks to avoid this result by arguing that the defendants had actual knowledge that their statements were false when made. Opposition Brief at 10. To support this contention, the plaintiff references the churn information to which the defendants allegedly had access via VeriSign and Amdocs. As previously explained, however, the plaintiff does not specify the type of information that VeriSign and Amdocs allegedly provided, who reviewed that information, or how that information contradicted the defendants' representations about churn, so the court cannot reasonably rely on this undefined information to infer the defendants' knowledge of facts contrary to those they represented. See *supra*. The allegations in the plaintiff's amended complaint are significantly less specific than the allegations that the Fifth Circuit held to sufficiently plead knowledge of falsity in *Lormand*. In that case, the Fifth Circuit pinpointed statements "quoted and referenced in the pleadings" illustrating that the individual defendants "contemporaneously but privately admitted" having actual knowledge of the falsity of their public

---

[18](...continued)
their affiliates, unlimited fixed-rate services plans in areas in which we offer or plan to offer service." 2008 Annual Report, *located in* Defendants' Appendix *as* Exhibit 1, at 000020-21, 000035-36.

representations.  See *Lormand*, 565 F.3d at 252.  The Fifth Circuit specifically observed that "[t]he complaint alleges that the defendants predicted publicly that US Unwired's use of the no-deposit programs would bring it long-range benefits and success, even though they knew the programs were a colossal mistake and would be economically disastrous for the company. . . .  In [one email], as quoted in the complaint, [a named defendant] stated that 'we have never approved of eliminating the deposit.'  Plaintiff quotes from corporate documents in his complaint indicating that US Unwired's managers misrepresented or concealed the truth because they knew that the no-deposit program would be harmful rather than beneficial to US Unwired."  *Id.* at 253.  Here, the plaintiff alleges only that the defendants knew or should have known that their forward-looking statements were false because the VeriSign and Amdocs systems must have revealed an undefined increase in churn resulting from the $49 handset promotion.  The plaintiff's bare assertions and vacuous references to "churn information" simply do not show that he is entitled to relief.  See *Iqbal*, 129 S.Ct. at 1950 (*quoting* FED. R. CIV. P. 8(a)(2)).  Accordingly, the plaintiff's allegations that the defendants knew or should have known that their statements were false when made are not sufficiently pleaded to pierce the aegis of the PSLRA's safe harbor.[19]  See *Southland*, 365 F.3d at 371 ("To avoid the safe

---

[19]     It is debatable whether an allegation of actual knowledge is enough to overcome the PSLRA's safe harbor for forward-looking statements that contain meaningful cautionary language.  In *Lormand*, the Fifth Circuit concluded that it does.

(continued...)

[19](...continued)

*Lormand*, 565 F.3d at 244 ("Because the plaintiff adequately alleges that the defendants actually knew that their statements were misleading at the time they were made, the safe harbor provision is inapplicable."). The same court's decision in *Southland*, however, suggests otherwise. See *Southland*, 365 F.3d at 371-72 ("The safe harbor has two independent prongs: one focusing on the defendant's cautionary statements and the other on the defendant's state of mind. . . . [T]he defendants have not shown that [the prediction of future earnings and revenues] were identified as forward-looking statements. Accordingly, the plaintiffs may properly allege a claim based on these statements *if* they were made with *actual* knowledge that they were false or misleading." (first emphasis added)). The PLSRA is "worded disjunctively -- that is, the safe harbor applies if the forward looking is accompanied by meaningful cautionary language, *or* if a plaintiff fails to prove that it was made with 'actual knowledge' that it was false or misleading." *Ezra Sholom*, 504 F. Supp. 2d at 161 n.6 (emphasis original). The statute states, in pertinent part, that "a person . . . shall not be liable . . . if . . . (A) the forward-looking statement is -- (i) identified as a forward-looking statement, and is accompanied by meaningful cautionary statements . . .; or (ii) immaterial; *or* (B) the plaintiff fails to prove that the forward-looking statement -- (i) if made by a natural person, was made with actual knowledge by that person that the statement was false or misleading. . . ." 15 U.S.C. § 78u-5(c) (emphasis added). The statute's plain language makes clear that even if the plaintiff could *prove* that the defendants made a forward-looking statement with actual knowledge of its falsity, the defendants would not be liable if the statement was immaterial or accompanied by meaningful cautionary language. See *Edward J. Goodman Life Income Trust v. Jabil Circuit, Inc.*, 594 F.3d 783, 794-96 (11th Cir. 2010) ("[A]n allegation of actual knowledge of falsity will not deprive a defendant of protection by the statutory safe harbor if his forward-looking statements are accompanied by meaningful cautionary language."); *In re Cutera Securities Litigation*, 610 F.3d 1103, 1113 (9th Cir. 2010) ("The logical reading of the statute is simply to take it as written-subsections (A) and (B) and their subpoints each offer safe harbors for different categories of forward-looking statements. The defendants' state of mind is not relevant to subsection (A). To read the provisions otherwise would make no sense."); *Miller v. Champion Enterprises Inc.*, 346 F.3d 660, 678 (6th Cir. 2003) ("[S]ince we conclude that the statements in Walter Young's July 8 Letter to Shareholders were both forward-looking within the meaning of the PSLRA, and that they were accompanied by meaningful cautionary language, the statements are subject to the safe harbor provisions of the PSLRA and are therefore not actionable. No investigation of defendant's state of mind is required.") (citing 15 U.S.C.

(continued...)

harbor, plaintiffs must plead facts demonstrating that the statement was made with

actual knowledge of its falsity.").

In addition to those statements concerning the 2009 guidance, which the court

holds are non-actionable forward-looking statements accompanied by meaningful

---

[19](...continued)
§ 78u-5(c)(1)(A)). To read the statute any other way would lead to absurd results. For example, an immaterial statement made by a defendant with knowledge of its falsity would be actionable, notwithstanding the fact that the statement by definition does not affect the total mix of information on which a reasonable investor would rely. See *Basic Incorporated v. Levinson*, 485 U.S. 224, 231-32 (1988) (citing *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 448-49). This cannot be what Congress intended. Cf. *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 345 (2005) ("[T]he statutes make [private securities fraud actions] available, not to provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause."); *Basic*, 485 U.S. at 238 ("[I]n order to prevail on a Rule 10b-5 claim, a plaintiff must show that the statements were *misleading* as to a *material* fact. It is not enough that a statement is false or incomplete, if the misrepresented fact is otherwise insignificant." (emphasis in original)); see also *Jabil Circuit*, 594 F.3d at 796 ("The anti-fraud provisions of the securities laws are plainly disinterested with immaterial statements, no matter the state of mind of the speaker."). To the extent that the later-decided *Lormand* conflicts with *Southland*, this court is bound by *Southland* because it is well-established rule in the Fifth Circuit that one "panel does not have the authority to overrule a previous panel's decision absent an intervening, contrary, or superseding decision by [the Fifth Circuit], sitting en banc, or by the Supreme Court." *Securities and Exchange Commission v. Janvey*, No. 09-10963, 2010 WL 5173073, at *2 (5th Cir. Dec. 17, 2010) (citing *United States v. Setser*, 607 F.3d 128, 131 (5th Cir. 2010)). Fortunately, this court need not decide the issue because the defendants' forward-looking statements were accompanied by meaningful cautionary language *and* the plaintiff has not pleaded with particularity facts sufficient to support his claim that the defendants had actual knowledge of the falsity of their representations.

cautionary language, the plaintiff has identified a number of statements made by MetroPCS or its senior executives that allegedly misled the investing public regarding the company's strength in light of the recessionary economy and increased competition from other prepaid wireless service providers. After careful consideration of the identified statements in their totality, the court concludes that these statements are not actionable either because they are not pleaded with particularity or because they are immaterial puffery.

A misstatement is material if there is a substantial likelihood that a reasonable investor would consider the information to be important in making an investment decision. *R & W Technical Services Ltd. v. Commodity Futures Trading Commission*, 205 F.3d 165, 169 (5th Cir. 2000) (citing *TSC*, 426 U.S. at 449)). For an omission "to fulfill the materiality requirement 'there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.'" *Basic*, 485 U.S. at 231-32 (quoting *TSC*, 426 U.S. at 449). Materiality "is not judged in the abstract, but in light of the surrounding circumstances." *Rosenzweig*, 332 F.3d at 866. "Accordingly, the disclosure required by the securities laws is measured not by literal truth, but by the ability of the statements to accurately inform rather than mislead prospective buyers." *Lormand*, 565 F.3d at 248.

An overwhelming majority of the defendants' statements about the economy that the plaintiff identifies as materially misleading are not material as a matter of law. The plaintiff's claims are based on the defendants' statements portraying a "strong," Amended Complaint ¶ 67, "resilien[t]," *id*. ¶ 41, 59, or "perfectly positioned," *id*. ¶¶ 40, 61, 62, company capable of withstanding the deteriorating economic conditions in the United States. These statements are immaterial because a reasonable investor would not find them important to the total mix of information available; rather, a reasonable investor, aware of the recessionary economy, would likely give little, if any, weight to these statements because they are "a certain kind of rosy affirmation . . . so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker." See *Securities and Exchange Commission v. Reynolds*, No. 3-08-CV-0384-B, 2008 WL 3850550, at *5 (N.D. Tex. Aug. 19, 2008) (Boyle, J.) (citation and quotation marks omitted). Moreover, practically all of the defendants' statements seemingly account for, and caution about, the recessionary economy. *See*, *e.g.*, Amended Complaint ¶ 40 ("significant headwinds of a deteriorating economy"); ¶ 41 ("as our economy makes its way through these difficult economic times"); ¶ 48 ("very difficult times"); ¶ 59 ("the U.S. economy continues to be challenged"); ¶ 61 ("the economy will continue to struggle for the foreseeable future"); ¶ 62 ("troubled economic times"); ¶ 71 ("very, very difficult times"); ¶ 81 ("tough economic times"); ¶ 85 ("challenging economic conditions persist"); ¶ 86 ("difficult economic times").

To the extent the plaintiff is arguing that the defendants should have painted an even gloomier picture, the plaintiff's position has no basis in law because the defendants are under no duty to cast their business in an overly gloomy or pejorative light. See *Rosenzweig*, 332 F.3d at 869 (explaining that a company is "under no duty to cast its business in a pejorative, rather than a positive, light."); *Abrams*, 292 F.3d at 433 ("[A]s long as public statements are reasonably consistent with reasonably available data, corporate officials need not present an overly gloomy or cautious picture of the company's current performance.").

The plaintiff has, however, identified two statements that are worthy of brief mention. First, while at the Raymond James Conference, Carter stated that MetroPCS "is actually accelerating its growth" during "these very difficult times." Amended Complaint ¶ 48. Unlike the statements that project the company's endurance through challenging economic conditions, this statement is a specific representation about a present fact: that MetroPCS was growing during the recession. The plaintiff, however, does not allege that this statement was false when made. In fact, the plaintiff does not dispute that MetroPCS experienced increases in subscriber growth during the class period; instead, he alleges that the defendants' representations did not reflect the likely effects that the recessionary economy would have on the company's business. However, the plaintiff's conclusory allegation -- that the "[d]efendants knew the Company was suffering from the recessionary economy,

which was negatively impacting business and causing the defendants to offer overly-aggressive promotions," *e.g.*, *id.* ¶ 80, -- is not enough. The plaintiff fails to allege with particularity "how" the company was suffering from the recessionary economy, or any basis for inferring that the defendants knew or should have known such was the case yet failed to disclose that fact.

Second, the plaintiff alleges that Linquist, commenting on the August Press Release, stated: "Although we experienced an increase in churn during the second quarter, this was due in part to our success in delivering increased gross additions over the previous nine months, seasonality and handset upgrades from customers who did not identify themselves as existing customers." Amended Complaint ¶ 85 (emphasis omitted). Again, this statement is a specific representation about a present fact, but again, the plaintiff fails to allege that this statement was false when made (for example, that the company did not experience increased gross additions, or that seasonality and handset upgrades did not increase churn). Instead, he contends that Linquist failed to disclose the true nature of the relationship between the recessionary economy, the handset promotion, and MetroPCS's second-quarter increase in churn. *See* Opposition Brief at 1-2. The plaintiff does not allege how the company was suffering from the economy, he does not plead with particularity any facts to support his claim that the defendants knew or should have known -- via the information supposedly provided by VeriSign and Amdocs, or otherwise -- that churn was

increasing because of the handset promotion, and he does not allege why Linquist's

alleged omissions were material.[20]  Even if the court assumes that some of

MetroPCS's class-period growth was in fact due to an increase in disloyal customers,

it does not follow that MetroPCS did not experience additional unrelated growth.

The plaintiff does not allege facts that would suggest that all of MetroPCS's growth

during the class-period was due to the handset promotion, and that the defendants

knew of this fact and did not disclose it.  Again, because the plaintiff fails to plead

with particularity how the alleged churn information provided by VeriSign and

Amdocs contradicted the defendants' representations on the matter, it would be

unreasonable for the court to infer that the defendants' statements about the

relationship between the economy, the handset promotion, and churn were false

when made.  The plaintiff's claim that Linquist's statements were false or misleading

is not plausible.

The final group of statements that the plaintiff contends were materially false

or misleading are statements concerning competition from other prepaid wireless

_____

[20]        The plaintiff also highlights a statement made by one of the defendants,
at the Barclay's Conference, that the MetroPCS business model is "contra-cyclical,"
meaning that it would perform better in the struggling economy.  Amended
Complaint ¶ 81.  In addition to failing to plead who made this statement, the
plaintiff does not allege that the model's performance was not contra-cyclical when
the defendants made that representation.  Since the plaintiff does not dispute that
MetroPCS did in fact experience subscriber growth during the class period, he has
failed to state a claim for securities fraud based on the defendants' representation that
the company's business model was contra-cyclical.

service providers.  All of these statements were made in conjunction with the company reaffirming the 2009 guidance.  *E.g.*, Amended Complaint ¶ 49 ("we reaffirmed our guidance . . . after Boost had been out there for over a month."); ¶ 74 ("we have delivered more gross gains, more handset sales, and more payment sales to these guys in the last 12 months than ever.  So I feel pretty confident how we stack up."); ¶ 77 ("Yes, I think we've seen them [Boost], but we had the best growth quarter we've ever had."); ¶ 90 ("we haven't seen the introduction of Track phone influencing our numbers at Wal-Mart.  I can't speak for the competition, but so far that hasn't been the case.").  The plaintiff fails to plead with particularity why these statements were false when made.  See *Goldstein v. MCI WorldCom*, 340 F.3d 238, 245 (5th Cir. 2003) (citing *ABC Arbitrage Plaintiffs Group v. Tchuruk*, 291 F.3d 336 (5th Cir. 2002) (explaining that a plaintiff pleading a false or misleading statement or omission as the basis for a section 10(b) and Rule 10b-5 securities fraud claim must, to avoid dismissal, specify the "who, what, when, where, and how" of securities fraud).  Additionally, the statements made by the defendants regarding the company's strength in light of increased competition, Amended Complaint ¶ 74 ('very strong competitive position"); *id.* ("pretty confident how we stack up"); *id.* ¶ 71 ("perfectly situated"), are non-actionable immaterial puffery.  See *Magruder*, 2009 WL 854656, at *18; *Reynolds*, 2008 WL 3850550, at *5.

The plaintiff has failed to allege facts sufficient to support a strong inference of scienter, and his claims against the defendants must therefore be dismissed. Even if it is assumed *arguendo* that he properly pleaded scienter, the plaintiff has failed to state a claim for securities fraud because his amended complaint lacks the particularity necessary to state a plausible fraud claim and adequately put the defendants on notice of the charges against them, and the statements alleged to be false or misleading are either forward-looking statements protected by the PSLRA or immaterial puffery. Accordingly, the plaintiff's section 10(b) and Rule 10b-5 fraud claims are dismissed.

### 4. *The Section 20(a) Claim*

In addition to the section 10(b) and Rule 10b-5 claims, the plaintiff alleges that the senior executives are liable as control persons under section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). Amended Complaint ¶¶ 137-38. Under section 20(a), "Every person who, directly or indirectly, controls any person liable under any provision of this chapter . . . shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable. . . ." *Id.* When a primary violation by the "controlled person" has not been adequately pled, the court should dismiss the section 20(a) claim. *Southland*, 365 F.3d at 383 ("Control person liability is secondary only and cannot exist in the absence of a primary violation."). Because the plaintiff has failed to adequately plead

an underlying violation of the Exchange Act, the court must dismiss his section 20(a) claim. *Ezra Sholom*, 504 F. Supp. 2d at 168-69.

### III.  CONCLUSION

For the above stated reasons, the defendants' motion to dismiss the amended complaint for failure to state a claim is **GRANTED**.

**SO ORDERED**.

March 25, 2011.

_____
**A. JOE FISH**
**Senior United States District Judge**